# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

In the matter of the seizure of:

| | |
|---|---|
| All Funds in BMO Harris Bank N.A. Account ██████6937, in the name of Craig A. Reynolds and Lana K. Reynolds, | Case No. 22-SW-00724-LMC |
| 2022 Harley Davidson Motorcycle, VIN: 1HD1TCL16NB951086, | Case No. 22-SW-00725-LMC |
| 2020 Lincoln Navigator, VIN: 5LMJJ2LT1LEL12024, and | Case No. 22-SW-00726-LMC |
| 2021 Ford F-250, VIN: 1FT7W2B69MEC53417 | Case No. 22-SW-00727-LMC |

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Milan Vrabac, after being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, and have worked in this position since September 2012.  I am currently assigned to the Kansas City Field Office – St. Joseph, Missouri Resident Agency.

2.      As explained in detail herein, I respectfully submit that there is probable cause to believe that Craig A. Reynolds ("REYNOLDS") and James L. McGinnis ("McGINNIS"), doing business as Medical Cost Sharing Inc. (hereinafter MCS), having devised a scheme and artifice to defraud in order to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, in violation of Title 18, United States Code, Section 1343, and a conspiracy to commit wire fraud in violation of Title 18, United States Code, Sections 1343 and 1349.

3.     The statements contained in this affidavit are based in part on my personal knowledge, as well as knowledge, information and documentation I obtained from other law enforcement officers.  Because this affidavit is submitted for the limited purpose of obtaining a seizure warrant, it does not contain every fact regarding this investigation.

4.     As set forth below, there is probable cause to believe REYNOLDS and McGINNIS, doing business as MCS, executed a scheme to commit wire fraud beginning in or around July 2013 and continuing to the present, by defrauding hundreds of MCS members. In brief, the scheme involved collecting monthly "contributions" from "like-minded" Christians, purportedly to be added to a pool of funds to be shared by other members in the event healthcare costs exceed a member's "personal responsibility." To date, members have transferred, by means of wire, at least $7,549,518.81 in contributions to MCS. Yet REYNOLDS and McGINNIS failed to "share" medical expenses as promoted and promised. Between December 2015 and May 31, 2022, MCS distributed only approximately 3.26% of total contributions.

5.     There is probable cause to believe the property described below constitutes or is derived from proceeds obtained, directly or indirectly, from violations of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud). There also is probable cause to believe the property described below was used to conceal the nature, source, ownership and control of wire fraud proceeds in violation of 18 U.S.C. § 1956 and § 1957. Accordingly, the property described herein is subject to forfeiture and seizure pursuant to 18 U.S.C. § 981(a)(1)(A) (civil

money laundering), 18 U.S.C. § 981 (a)(1)(C) and 28 U.S.C. § 2461 (civil and criminal wire fraud), and 18 U.S.C. § 982(a)(1) (criminal money laundering).

## PROPERTY TO BE SEIZED

6.     This application is presented in support of issuance of seizure warrants for the following property (together the "Subject Properties"):

    a.  **BMO Harris Bank N.A. Account** ███**6937**, in the name of Craig A. Reynolds and Lana K. Reynolds.

    b.  **2022 Harley Davidson Motorcycle, VIN: 1HD1TCL16NB951086**, in the name of Craig A. Reynolds.

    c.  **2020 Lincoln Navigator, VIN: 5LMJJ2LT1LEL12024**, in the name of Lana K. Reynolds.

    d.  **2021 Ford F-250, VIN: 1FT7W2B69MEC53417**, in the name of James L. McGinnis.

## PROBABLE CAUSE[1]

### *OVERVIEW OF THE CONSPIRACY*

7.     Beginning in or about July 2013 through present, REYNOLDS and McGINNIS conspired to use false and fraudulent pretenses, representations, and promises to perpetuate a scheme to defraud hundreds of "ministry members" in connection with their organization, Medical Cost Sharing, Inc., a promoted "Health Care Sharing Ministry" and IRS-designated 501(c)(3) non-profit organization.

---

[1] The Probable Cause section, paragraphs 7 through 170, is identical to the probable cause section of the concurrently submitted Affidavit in Support of Search Warrant.

3

8.     To induce members to pay "monthly contributions" (i.e. membership dues), REYNOLDS and McGINNIS, doing business as MCS, repeatedly and falsely assured members their monthly "contributions" would be used to assist in sharing the medical costs of "like-minded" Christians.   To date, members have transferred, by means of wire, at least $7,549,518.81, to accounts held or controlled by MCS and REYNOLDS.

9.     However, in contradiction to their public representations, REYNOLDS and McGINNIS failed to "share" medical costs for most of their members' medical claims - spending only approximately 3.26% of total contributions "sharing" medical costs between December 2015 and May 2022.

10.     Instead, REYNOLDS and McGINNIS used monthly contributions for their personal benefit and self-enrichment.

## CERTAIN RELEVANT PERSONS

11.     Since at least July 2016, MCS's day-to-day business was conducted by REYNOLDS, McGINNIS, and MCS office employee Eva Silcott.

12.     According to MCS records, REYNOLDS, the Chief Executive Officer/Founder of MCS, attended California Polytechnic State University and was employed for over 25 years in "personalized financial services specializing in customer care and successful self-employment."

13.     A review of the website for the National Association of Insurance Commissioners revealed that REYNOLDS held Missouri insurance license number 102584 until August 5, 2009, when it was revoked.  An open records Internet search revealed that the Director of the Missouri Department of Insurance issued Consent Order on August 5, 2009, against REYNOLDS revoking REYNOLDS' insurance license for several violations, including forging signatures on

4

applications. Complaints against REYNOLDS, which led to his Missouri license revocation, were first reported to the State of Missouri in April and May 2008.

14.     Additionally, according to a Summary Order (Docket No. 4000-SO) from the Commissioner of Insurance of the State of Kansas, in April 2009, REYNOLDS "signed the name "B.C" to an insurance application without B.C's permission or knowledge." REYNOLDS, "when submitting the above insurance application, also included an authorization for direct bank withdrawal for payment of the insurance policy that was applied for without B.C's permission." Accordingly, "based on [REYNOLDS'] forgery and submission of bank information, the Commissioner concludes that sufficient grounds exist for the revocation of [REYNOLDS'] insurance agent's license…**IT IS THEREFORE ORDERED BY THE COMMISSIONER OF INSURANCE THAT** the Kansas nonresident insurance agent's license of Craig A. Reynolds is hereby **REVOKED...IT IS SO ORDERED THIS 17TH DAY OF JUNE 2009.**" [emphasis in original]

15.     According to the same MCS records, McGINNIS, the Chief Operating Officer/Co-Founder of MCS, served in the US Navy for four years. McGINNIS "graduated [US] Navy Supply School in San Diego, California, specializing in stock and inventory control, management of all repair parts, commissary goods, storage, distribution and procurement" and served in Vietnam from 1967 to 1968. After the Navy, McGINNIS purportedly "owned several successful businesses over the past 30 years."

16.     A review of the same Insurance Commissioners' website revealed that McGINNIS held Missouri insurance license number 101829 until February 28, 2018, when he allowed it to become inactive.

5

17.     According to financial records, Eva Silcott (hereinafter, SILCOTT) has been employed with MCS since at least July 2016.  SILCOTT maintains most of the day-to-day communication with MCS members and responds directly to MCS member inquiries.  Along with REYNOLDS and McGINNIS, emails obtained by the FBI depict SILCOTT as involved in the determination to pay or deny member medical claims (i.e. the "sharing" of medical costs).

18.     According to the IRS Form 990 – *Return of Organization Exempt from Income Tax* filed by MCS for tax years 2015-2018, LANA REYNOLDS (wife of REYNOLDS, hereinafter LANA) was listed as "Director" of MCS.  Additionally, according to financial records, LANA was listed as a signatory on MCS financial accounts from at least February 25, 2016 through at least May 2022.  In a June 2022 joint FBI/IRS interview, LANA stated she helped established MCS and provided the interviewing agents with a knowledgeable summary of MCS operating methods.

### HISTORY OF MEDICAL COST SHARING, INC.

19.     On or about July 8, 2013, REYNOLDS solely signed and filed the *Articles of Incorporation of a Nonprofit Corporation* for "Medical Cost Sharing" with the State of Missouri. On or about the same date, the State of Missouri certified and declared MCS a body corporate, duly organized and entitled to all rights and privileges granted corporations organized under the Missouri Nonprofit Corporation Law. On or about July 11, 2013, the IRS assigned an employer identification number (EIN) to MCS.

20.     On or about October 3, 2013, *Form 1023 – Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code*, was filed with the United States Internal Revenue Service (hereinafter, IRS) on behalf of MCS by Steven C. Prine, listed as

6

Secretary/Treasurer/Director of MCS on the Form. The filed form lists REYNOLDS as President/Chairman and McGINNIS as Executive Vice President/ Director of MCS.

21.     On or about May 21, 2014, the IRS approved the application for 501(c)(3) status via a favorable determination letter sent to MCS. In the letter, the IRS states "Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter [509(a)(2)]."

22.     According to the *Exemption Requirements – 501(c)(3) Organizations* "to be tax-exempt under section 501(c)(3) of the Internal Revenue Code, an organization must be organized and operated exclusively for exempt purposes set forth in section 501(c)(3), and none of its earnings may inure to any private shareholder or individual."

23.     On or about May 15, 2016, the federal tax-exempt status of MCS was automatically revoked for failure to file a Form 990-series return or notice for three consecutive years. Form 990-series returns are annual financial information returns required to be filed with the IRS by most organizations, including MCS, exempt from income tax.

24.     On or about August 31, 2017, MCS filed a second *Form 1023 – Application for Recognition of Exemption under Section 501(c)(3)* application with the IRS to have its 501(c)(3) charitable status retroactively re-instated. On or about March 8, 2018, the IRS approved MCS's application and reinstated MCS's 501(c)(3) status effective back to the date of its revocation, May 15, 2016.

25.     To date, MCS's 501(c)(3) tax-exemption status remains active.

26.     In addition to MCS, REYNOLDS formed a limited liability company in April 2019 with the Missouri Secretary of State's office named "Wise Health Card LLC."

7

REYNOLDS lists his personal residence as his address as an organizer and the registered agent. The MCS webpage has recently updated to provide an option for a "Premier Plus" plan which is subtitled "The Wise Health Card." In addition, various videos on the MCS website explain "The Wise Health Card" as a version of their premier plan. A website, accessible at wisehealthcard.com, appears to offer a variation of MCS's claimed medical cost coverage, including various references to reference-based pricing, without any claim of a purported health care ministry association.

27. MCS maintains a business address at 4221 Mitchell Avenue, Room 120, St. Joseph, MO 64507. Individuals can enroll for MCS services online, or one can schedule a call with an MCS representative through the website. MCS solicited new members through insurance brokers, advertising on Christian-affiliated radio, social media, and its website located at https://www.mcsmedicalcostsharing.com - amongst other venues.

**Use of Medical Cost Sharing to Perpetrate the Fraud**

***FALSE PROMISES***

28. Since inception, MCS repeatedly and falsely assured members their monthly "contributions" would be used to assist in sharing the medical costs between all members. MCS also repeatedly and falsely promoted that if members submitted a medical claim, and MCS verified the claim with the medical provider, MCS would use member contributions to "share" that member's medical expenses. Lastly, MCS used their 501(c)(3) designation to promote the organization as "operated for charitable purposes" and "not profit-based." However, investigation revealed these claims to be misrepresentations used by MCS to elicit funds from MCS members.

8

29. According to MCS's website, MCS Medical Cost Sharing is "a 501 C3 Non-Profit Christian Healthcare Sharing Ministry" and "a community of like-minded people who rely on each other to pay their medical bills."

30. According to MCS promotional materials, MCS declared "while we are not an insurance company, many think of us as Christian Health Insurance, or Christian Medical Insurance because, like conventional insurance plans, we help you pay your healthcare costs. We help you protect your family. But unlike these corporate, profit based plans, we are a healthcare sharing ministry….your healthcare costs are shared with other Christians enrolled in our medical sharing plans. This in [sic.] accordance with long held Biblical traditions of neighbors sharing burdens."

31. "All members of our ministry require [sic.] to pay a "Monthly Contribution." The monthly contributions are collected from all members every month and are used to support those members who get sick or injured by paying their medical bills."

32. "Furthermore, all MCS plans "have a 'personal responsibility' (which is like a deductible if we were a health insurance company) that must be met before MCS will pay for qualified expenses." "After your personal responsibility is met and the medical necessity verified by Medical Cost Sharing staff, your payment, which is shared by other members, is sent directly to the medical professional you used. This will be in your name." "Most claims are usually paid within 60 days."

33. According to an attachment filed with MCS's second (reinstatement) *Form 1023 – Application for Recognition of Exemption under Section 501(c)(3)* filed on or about August 31, 2017, section "Statement One Part IV, Narrative Description of Activities" states "Medical Cost Sharing, Inc. is a nonprofit corporation organized and operated solely for religious and charitable

9

purposes. Specifically, the organization was formed in 2013 to serve people have [sic.] like-minded religious beliefs. Medical Cost Sharing is a Religious Healthcare Sharing Ministry." Additionally, the form states:

> Medical Cost Sharing believes people of like-minded religious beliefs should help each other in the area of heath care needs. Following Galatians 6:2, which instructs us to 'Carry each other's burdens, and in this way you will fulfill the law of Christ.' Members of Medical Cost Sharing will contribute monthly membership fees, also called "Shares." The Shares are collected and processed by the Medical Cost Sharing staff. Then when a member has a medical need, the member sends proof via mail or email of the need to Medical Cost Sharing. Once Medical Cost Sharing receives a copy of the member's need, a staff member contacts the member's medical provider. Medical Cost Sharing then agrees on an amount with the provider that is most affordable for Medical Cost Sharing and the member in need. Medical Cost Sharing will then send that amount of funding to the member to assist with their medical needs. Medical Cost Sharing will post the member needs shared on its website so that members can see who the "Shares" are going to each month.[2]

### PROMOTION OF MCS AS A 'HEALTH CARE SHARING MINISTRY'

34. Since its incorporation, REYNOLDS and McGINNIS have touted MCS as a Christian Healthcare Sharing Ministry and that MCS ~~that~~ was an "approved" or "legal" alternative to the Affordable Care Act (Obamacare). According to archive.org, since at least 2015 through present time, MCS's website describes MCS as a 501(c)(3) Non-Profit Organization and Christian Healthcare Sharing Ministry.[3]

35. According to archive.org, on March 3, 2015, MCS's website read, "Is this a legal alternative to the Affordable Care Act (Obamacare)? Yes, most people are not aware nor fully understand the loopholes that are available to them in the ACA – Affordable Care Act or

---

[2] Investigation found no evidence that "member's needs shared" were ever posted to the MCS website.

[3] Archive.org is a digital archive of the World Wide Web created to allow a user to "go back in time" in order to view how websites appeared in the past. Past websites are only viewable if they were archived, which for most websites, only occurred sporadically in a given year.

10

(Obamacare).  One such loophole is Christian health sharing ministries because of their religious beliefs."

36.     According to a promotional email to Victim-1 dated August 2016, sent via sales@medicalcostsharing.com, MCS "offers **approved** [emphasis in original] Christian Medical Sharing alternatives to traditional health insurance and the Affordable Healthcare [sic.] Act (ACA), commonly known as Obamacare."

37.     According to the August 2016, October 2017, October 2018 and May 2019 versions of MCS's Membership Guidelines, MCS declares, "We are a LEGAL alternative to OBAMACARE." [emphasis in original].

38.     According to archive.org, a former section published on the MCS website, between at least October 2016 and May 2018 read:

> According to the laws passed by the congress (A.C.A Obamacare) all Christian Medical Cost Sharing organizations formed prior to Dec 31, 1999 that have been in continuous service are exempt from all penalties from Obamacare.  We here at MCS Medical Cost Sharing Inc. were not in business prior to Dec of 1999, **but we have set aside 2.5% of all sharing contributions into a separate account that will ONLY be used if there are MCS Members that need the funds.[4]**

As of at least May 2018, the following verbiage was added at the end of the previous paragraph:

> **In addition, all MCS plans contain a "Minimal Essential Coverage" MEC plan built into them.  This is another way that we qualify as a legal alternative to Obamacare.  <u>As of 2018, NO MCS MEMBERS has had to pay a single penny out of their pocket in ACA Fines.</u>"** [emphasis in original]

39.     Finally, according to archive.org, until at least February 2, 2019, MCS described itself, via the MCS website, as a "**Legal Alternative to Traditional ObamaCare**:  **Medical Cost Sharing** is a **501 C3 Non-Profit Faith Based Corporation** and **legitimate, legal**

_____

[4] The FBI found no bank accounts set aside where 2.5% of all sharing contributions were kept in case MCS members needed funds.

11

**alternative** to traditional **ObamaCare**, helping you pay your heatcare costs. As we are a healthcare sharing ministry, we do not have profit-based plans."[5]

40.     In multiple instances, MCS declared themselves a 'Health Care Sharing Ministry' that was a "legal" or "approved" alternative to the Affordable Care Act (ACA).  Health care sharing ministries are permitted by many states but prohibited by others. For example, Missouri has a "safe harbor" provision exempting an entity from the regulations and laws relating to health insurance, health maintenance organizations, health benefit plans, and others. RSMo. 376.1750. Other states, such as California, have issued cease and desist orders to "health care sharing ministries," alleging they do not conform to the various provisions of federal and state laws. While MCS continues to identify itself as a legitimate Health Care Sharing Ministry (HCSM), MCS does not appear to meet the requirements for an a HCSM under 26 U.S.C. Section 5000A(d)(2).[6]

41.     Under 26 U.S.C. Section 5000A(d)(2), the term "healthcare sharing ministry" is defined as an organization –

> (I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),
> (II) members of which are a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,
> (III) members of which retain membership even after they develop a medical condition,

---

[5] On January 1, 2019, the federal tax penalty assessed to individuals who failed to enroll in an ACA compliant plan was removed.  Therefore, whether a plan was a "legal" or "approved" alternative to ACA remained of little significance.  FBI research identified that soon after the removal of the tax penalty, MCS no longer used language suggesting MCS plans were a "legal" or "approved" alternative to ACA.

[6] On November 17, 2021, Senior US District Judge Honorable Joseph M. Hood – Eastern District of Kentucky –upheld via *Judgment Against the Aliera Companies, Inc.* (5:20-CV-00496-JMH Document #72): to be considered a legitimate Health Care Sharing Ministry, an entity must meet all criteria as outlined in 26 U.S.C. Section 5000A(d)(2).

12

(IV) which (or a predecessor of which) has been in existence at all times since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

42. MCS has used the HCSM qualifier to promote MCS services from its beginning. However, as further detailed below, MCS failed to continually share medical expenses amongst members in accordance with their shared beliefs, failed to allow members to retain membership after they developed medical conditions, was not in existence until 2013, and failed to conduct annual audits performed by an independent certified public accounting firm.

***MISREPRESENTATION OF REFERENCE BASED PRICING (RBP)***

43. Since inception, MCS has required its members to meet a Personal Responsibility (i.e. deductible) before MCS "shared" any medical costs. However, per MCS policy, the only portion of an MCS member's medical claim allowed to go toward that member's Personal Responsibility was the amount returned by a Reference Based Pricing system ("RBP"). According to records reviewed by the FBI, MCS contracted Hawaii Mainland Administrators (hereinafter, HMA) to run medical claims through an RBP system until November 2018. Records reviewed by the FBI reveal MCS contracted Context 4 Healthcare to run medical claims through Context's RBP system from November 2018 to present.

44. RBP is a process which can be used by legitimate insurance companies to determine a reasonable cost for medical services. RBP can establish prevailing prices for medical services using objective and normative data such as Medicare Rates, cost data, average reimbursements/payments, and other public and private data sources. Various treatments, such as childbirth without complications, are billed to insurance companies, which may then negotiate to pay a prevailing price, or percentage of the billed price. MCS selected a percentage of the bill

from options offered in RBP, but never negotiated that or any lower price with the provider. MCS just presented the selected lower payment to its members as if it had provided them with a service. To the contrary, MCS appears to have used the lower price to ensure its members did not meet their "personal responsibility."

45.     MCS promoted RBP as a system that repriced medical claims for its members. According to MCS's corporate website, "Frequently Asked Questions" section, under the subsection titled, 'How are claims repriced?', the website reads, "MCS utilizes Reference-Based Pricing, the most recognized payment platform in the industry." Within the October 2020 MCS Member Guidelines, MCS explained "if the [medical bill] amount is $50,000 and after being ran through the RBP, the allowed amount is $12,000, you are responsible for $10,000 and MCS pays the remaining $2,000."

46.     As noted, MCS promoted RBP as system that provided MCS members with substantial savings on medical claims.  According to a letter sent to the Missouri Office of the Attorney General (hereinafter, MOAG), signed by McGINNIS and dated July 13, 2020, MCS described RBP to an MCS member stating: "[Member's] claim was $15,921.86. This claim was ran through the Reference-Based Pricing System and was priced down to $1,328.39 – a savings of $14,593.47."

47.     In an email sent from claims@mcsmedicalcostsharing.com, to Victim-7, MCS described RBP to a second MCS member stating: "The billed amount was $16,465.86.  The repriced amount was $4,330.46, and your savings by virtue of your membership was $12,135.40, and is exactly how the program is supposed to work."

48.     Because MCS didn't negotiate the price with the health care provider, the RBP system did not "re-price" claims nor did the system provide "savings" as MCS represented.

14

49.     According to an April 2022 email to the FBI from an attorney representing Context 4 Healthcare:

> Context does not re-price any claims.  Context only acts as a reference point for a payer client to retrieve one or more of the following:
>
> 1. A percentile of a Context Usual, Customary and Reasonable (UCR) fee. (percentile options are 25,30,35,40,45,50,55,60,65,70,75,80,85,90, or 95 and are chosen by the client).
> 2. A multiple of a Medicare Fee. (The multiple is set by the client)
> 3. A percentage of a provider submitted charge. (The percentage is set by the client)

50.     Thus MCS, as Context 4 Healthcare's client, chose the percentage or multiple of the UCR or Medicare fee to be returned.  For each medical service fee inputted into Context 4 Healthcare's RBP System, MCS would receive up to three different "returned prices" based on the percent/multiple chosen by MCS.  MCS could then choose which price to provide to MCS members as the RBP "returned price."  According to MCS documents, MCS would use the RBP returned price to negotiate the costs of medical services rendered to MCS members.  However, MCS conducted no negotiation.

51.     The system's "returned price" equaled MCS's chosen percentage of a member's submitted medical charge.  This percentage was chosen solely by MCS and was not based on any set standard of "reasonable and allowed" charges.

52.     Of note, MCS concealed from its members that MCS could manipulate the RBP returned prices by choosing different RBP 'returned pricing' options.

53.     According to records provided by Context 4 Healthcare and verified by documents provided by victims interviewed by the FBI, on multiple occasions MCS chose the lowest RBP option to provide to MCS members as the RBP "returned" amount, which was not based on Medicare allowed charges or any other measurable factor.

15

54.     MCS called the RBP returned price their "allowed charges" or "allowed coverage."  Because the aggregate of "allowed charges" went towards an MCS member's annual Personal Responsibility (i.e. deductible), MCS could manipulate RBP returned prices to ensure MCS members would never meet their deductible, as seen in Victim-7's account below.  If MCS members did not meet their deductible in a year, MCS would not have to "share" medical costs.

**MCS Member Accounts**

55.     As detailed herein, MCS duped members into enrolling with MCS through false promises, promotional brochures, membership guidelines and web-based information.  Though medical claims were denied by MCS for a variety of reasons, investigation found most identified victims were denied "shared" payments from MCS based on common factors.

56.     First, numerous victims were denied "shared" payments based on what MCS labeled as Pre-Existing Conditions ('PEC') – even though MCS had promoted and promised PEC were covered "from day one."  As justification to deny these payments, MCS told victims that PEC were only covered as "graded benefits."  "Graded benefits" was promoted by MCS as amounts paid out increasing yearly, or omitted from informational materials produced by MCS.

57.     In practice, "graded benefits" meant MCS would only run a member's medical claims through an RBP system as described above and would not actually cover any of the medical costs.  Once the claims were run through an RBP system, MCS misinformed MCS members that their medical claims had been "re-priced" to a significantly lower sum even though RBP could not and did not discount the cost.

58.     Second, multiple members were denied claims after MCS declared the victim failed to list a PEC (identified by REYNOLDS, McGINNIS or SILCOTT as a PEC – not medical professionals) on their application.

16

59.     Finally, on multiple occasions, MCS simply ceased communication with members after they filed medical claims with MCS, making it impossible for members to receive "shared" funds to pay medical bills.

### VICTIM-1

60.     On or about December 1, 2016, Georgia-based Victim-1 and family became members of MCS.   According to the victim, MCS was chosen specifically because MCS promised, first, a return on contributions- meaning that after ten years of being a member, all monthly dues paid by a member minus funds used to pay a member's medical claims – would be reimbursed to the member. Second, MCS promised to set aside 2.5% of all shared contributions (i.e. membership dues) into a separate account that would only be used if MCS members needed the funds. Third, MCS promised a Vanishing Personal Responsibility – wherein, MCS would reduce the Personal Responsibility (i.e. deductible) by $100.00 for every year they were members of MCS.   Finally, the victim chose MCS because they purportedly were a Christian organization and promised to live by a Christian philosophy.

61.     Victim-1 chose MCS's "Gold Family Plan A" which carried a monthly payment of $784.00 and a $1,000.00 Personal Responsibility (i.e. deductible).   In total, Victim-1 paid approximately $11,760.00 in membership dues.   According to the victim, neither Victim-1, nor the victim's family, were asked by MCS to submit information regarding PEC before or after enrolling in MCS.   The only information Victim-1 received about PECs was found in the MCS Membership Guidelines which stated, "future medical bills for diagnosis or treatment of a pre-existing medical condition which existed prior to membership will be eligible for sharing as follows:   medical records indicate the diagnosis/condition has gone 36 continuous and consecutive months without signs, symptoms, treatment or medication."

17

62.     Around May 2017, Victim-1's husband woke up with extreme back pain. Having had kidney stones approximately 12 and half years earlier, he believed the pain was caused by kidney stones.  Upon medical examination, his medical provider confirmed the pain was a result of kidney stones and set forth a treatment plan.  Before receiving any medical treatment, Victim-1's husband had the providers contact MCS for pre-authorization as per MCS policy.  On or about May 18, 2017, pre-authorization was given by MCS for the "Fragmenting of a Kidney Stone" via an MCS Authorization Form with Authorization ID# 120272.  A second pre-authorization was given for "Cysto/Uretero W/Lithotripsy" via an MCS Authorization Form with Authorization ID# 123198.[7]

63.     Approximately eight months after the first treatment, on or about January 22, 2018, Victim-1 received a bill from a medical provider for $67,119.50.  Victim-1's husband called MCS to inquire why he would be receiving a bill when the victims paid MCS "monthly contributions" in order to "share" costs.  Victim-1 was told MCS had denied all claims related to the kidney stone due to a 'pre-existing condition' of the prior kidney stone.

64.     Although MCS labeled the kidney stones a PEC, per MCS Guidelines issued at the time of the surgery, PECs "will be eligible for sharing as follows: medical records indicate the diagnosis/condition has gone 36 continuous and consecutive months without signs,

---

[7] On August 31, 2016, REYNOLDS, via sales@medicalcostsharing.com, sent a promotional email to Victim-1 that stated "I want to share a story about Barb…Within a couple years, Barb had what she thought was a "kidney stone" with pain her back and difficulty breathing.  She had to see several Doctors and Physicians Assistants, and lo and behold, she did have a kidney stone, but also an infection in her lungs.  She was hospitalized for just a week in May, and she's fine now.  But her bill was over $30,000.  Medical Cost Sharing ministry members shared that cost with her and prayed for her. Barb, her husband and family are not only fine physical, but spiritually and financially.  That is what we've tried to build with MCS, a ministry that prays, shares and members that stay safe, healthy and protected."

18

symptoms, treatment or medication." Victim-1 had not been diagnosed with kidney stones and was symptom free for over 12 years before the above claim.

65. Victim-1 made several attempts to get MCS to pay for medical claims, however, MCS continued to deny payment. On or about February 22, 2018, Victim-1 submitted a complaint to the Missouri Office of the Attorney General ("MOAG"). Two days later, Victim-1 hired a private attorney to assist in obtaining "shared" costs.

66. After negotiation between the Victim (along with their attorney) and MCS (along with their attorney), MCS agreed to pay Victim-1 approximately $15,638.72 towards Victim-1's medical bills. It was not until Victim-1 involved the MOAG and a private attorney that MCS "shared" medical costs, on March 13, 2018, and April 10, 2018.

*VICTIM-2*

67. In or around November 2017, California-based Victim-2 and her husband became members of MCS. According to the victim's husband, the victims needed coverage for a year and a half gap between COBRA and Medicare coverage and chose MCS because it offered a better financial option over traditional insurance companies and Obamacare.

68. The victim's husband completed an online application through the MCS website, provided his pre-existing conditions and stated his wife did not have any pre-existing conditions. Within the application, the victim's husband affirmed that "all information provided herein is true, to the best of my knowledge." After the application was filed, Victim-2's husband conducted a telephone call with representatives of MCS where he explained he previously had cancer and hip surgery and agreed to not submit any claims associated with these two afflictions.

69. Victim-2 enrolled in MCS's "Plan A Gold" which carried a $565.00 monthly payment and $5,000 personal responsibility. In total, Victim-2 paid approximately $10,735.00 in

19

membership dues.  MCS never asked Victim-2 to submit medical records and, to the victim's knowledge, does not believe MCS ever contacted her medical providers to obtain records on her behalf, prior to Victim-2's stroke (as described below).  Before filing a claim for the stroke, Victim-2 and husband filed other claims with MCS for routine medical appointments, but these claims were not reimbursed by MCS.

70.     In early June 2019, Victim-2 suffered a stroke and was airlifted to a nearby hospital where she was treated during a multi-day hospital stay.[8]  On the day of the stroke, Victim-2's husband called MCS to notify them of the emergency, per MCS policy, which required members to notify MCS of emergencies as soon as possible.  When all treatments were completed, Victim-2's medical bills totaled over $125,000.00.  The claims for all bills were forwarded to MCS for processing.

71.     In a letter sent from McGINNIS to Victim-2, dated July 25, 2019, MCS terminated Victim-2's membership due to "not being truthful on [her] membership application." MCS said Victim-2 had PECs that were not listed on her application.  Specifically, in a follow-up letter dated August 9, 2019, McGINNIS stated "had she listed her high blood pressure, a question on what (if any) medication, dosage, how many ml, and how long she had been on that particular medication would have been asked…We understand she is not on medications, but we still needed to know about the high blood pressure, which dated back to at least 2015, before becoming a member. She would have been asked about any other health issues she may have the knowledge of.  That is the point that the question about height/weight (BMI) [Body Mass Index] would have been asked."

---

[8] Victim-2 held an insurance policy with the airlift company who provided the life flight to Victim-2.  As a result of that policy, the airlift company fully covered the approximate $55,000 life flight medical bill.

20

72.     In another letter from McGINNIS to Victim-2, dated August 29, 2019, McGINNIS stated, "Based on all the conditions that were not disclosed but revealed by medical records, including elevated blood pressure going back to 2015 where the reading was 170/102, as stated in the member's guide it is grounds for termination. [Victim-2] was not terminated for the blood pressure condition alone but for all the conditions that were not disclosed."

73.     McGINNIS attached several past medical records to the August 29, 2019, letter, that were highlighted to identify what MCS considered to be PEC not identified by Victim-2 within Victim-2's MCS application.  These medical records were used by MCS to deny coverage and terminate Victim-2's membership.  The highlighted portions of the records include BMI readings (identified by McGINNIS to be elevated), blood pressure readings without diagnosis of hypertension, a one-time blood pressure reading stating "stress-related problem episodic hypertension", night sweats due to menopause, a one-week duration cough (respiratory infection), shortness of breath with exertion, sinus surgery in 2012 and osteoarthritis of the knees.

74.     According to records, there was no diagnosis as to the cause of Victim-2's stroke and no finding that the stroke was caused by PEC.  According to the medical records identified by McGinnis and through an interview of Victim-2, Victim-2 was never diagnosed with hypertension by medical professionals. Victim-2 also said that before her MCS application, she had never been informed by a doctor that she had osteoarthritis of the knees though Victim-2 was aware her meniscus was thinning.  Finally, MCS never instructed Victim-2 or her husband that certain BMI readings were considered PEC.

75.     Of note, the records sent by McGINNIS to Victim-2 to justify MCS's denial of payment and Victim-2's termination were produced by Victim-2's medical provider and faxed to

Case 4:22-sw-00724-MDH Document 1 Filed 08/22/22 Page 21 of 63

SILCOTT on or about June 21, 2019 – approximately one and a half years after Victim-2 and her husband submitted their application and became members of MCS – indicative of post-claim underwriting.

76.    As Victim-2 resided in California during the period of MCS membership, MCS was required to abide by California state code.  By conducting post-claim underwriting, denying payment for medical services provided, and terminating Victim-2, MCS was in violation of California Health & Safety Code sections 1389.3.[9]

77.    Victim-2 and her husband spent several months and multiple phone calls attempting to obtain payments for her medical bills to no avail.  Since MCS provided no assistance, Victim-2's husband filed a Financial Assistance Application with Dignity Health (the hospital where Victim-2 received medical care) to try to reduce the cost of medical bills.

78.    In a letter dated March 2, 2020, Dignity Health stated "we have determined you are not eligible for financial assistance under the Dignity Health Policy.  You do qualify for a discount based on Dignity Health's Hardship Provision."  Consequently, Victim-2's hospital bill

---

[9] California Health & Safety Code section 1345 defines a Health Care Service Plan subject to regulation by the State as follows: (f) "Health care service plan" or "specialized health care service plan" means either of the following: (1) Any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees.

California Health and Safety Code Section 1389.3 provides: No health care service plan shall engage in the practice of post-claims underwriting. For purposes of this section, "post-claims underwriting" means the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the plan contract. This section shall not limit a plan's remedies described in subdivision (a) of Section 1389.21.

Section 1389.21(a) provides: (a) A health care service plan shall not rescind a plan contract, or limit any provisions of a plan contract, once an enrollee is covered under the contract unless the plan can demonstrate that the enrollee has performed an act or practice constituting fraud or made an intentional misrepresentation of material fact as prohibited by the terms of the contract."

22

– which alone totaled $122,315.00 – was adjusted to $18,925.12 ($16,000 had already been paid by Victim-2 prior to the adjustment). In addition to bills invoiced by other providers totaling at least $1,818.27, the grand total owed by Victim-2, after Dignity's adjustment, was approximately $36,743.39.63. After not receiving "shared" costs for their medical bills, on or about March 10, 2020, Victim-2 and her husband submitted complaints against MCS to both the MOAG and California Office of the Attorney General. In addition, they hired a private attorney who sent a demand letter to MCS for reimbursement of medical expenses accrued by Victim-2.

79.     In a letter dated June 25, 2020, MCS agreed to settle with Victim-2 for $15,000. Victim-2 paid at least $20,525.12 out of pocket. Victim-2 stated he would "not have received a dime" from MCS had he not filed a report with the MOAG and hired his own attorney.

**VICTIM-3**

80.     In or around October 2017, Missouri-based Victim-3 became a member of MCS. According to the victim, she chose MCS because MCS was the most financially reasonable option and she needed two years of "insurance" coverage prior to obtaining Medicare.

81.     Victim-3 completed an application online through the MCS website where she enrolled in MCS's "Plan D Platinum" which carried a $233.00 monthly payment and $10,000 personal responsibility. In total, Victim-3 paid approximately $4,893.00 in membership dues. Victim-3 never received information regarding MCS policies or membership guidelines directly from MCS. Furthermore, MCS never asked Victim-3 to submit medical records from her medical providers and, to the victim's knowledge, did not believe MCS ever contacted her medical providers to obtain records on her behalf before being accepted as a member.

82.     In June 2019, Victim-3 suffered a heart attack and was transported to the hospital via ambulance. Victim-3 was treated and released. Soon thereafter, the victim began receiving

23

bills from her medical providers for the full amount for her medical care with no payments deducted for "insurance" coverage (i.e. MCS "shared" costs). The hospital bill was $69,051.12 for services rendered. When Victim-3 called MCS for an explanation as to why they had not "shared" any cost of her medical bills, they told her they needed a Form UB-04 (i.e. a document with itemized medical charges) from the hospital in order to process her claim.

83. Around the end of July 2019, Victim-3 received a letter from MCS stating her membership had been terminated. According to the letter (dated July 25, 2019, and signed by McGINNIS), Victim-3's membership was terminated due to "not being truthful on your membership application" because Victim-3 stated she did not have PECs. In a letter from MCS to MOAG dated November 11, 2019, McGINNIS indicated that Victim-3 did not reveal her PEC of vaginal cancer, hypertension and history of smoking. Victim-3 stated that MCS was correct in that she did not include those in her application, however, Victim-3 did inform MCS of her cancer and smoking history in a phone call with MCS at the outset of her membership. Victim-3 stated she had never been diagnosed with hypertension by a medical professional.

84. On or about October 29, 2019, Victim-3 submitted a complaint against MCS to the MOAG. The same day, Victim-3 submitted a letter to MCS, in which she wrote:

> The welcoming letter we received from MCS dated 10/13/17 stated that we would receive a phone call within 5 business days to discuss important health history information. It was during this phone conversation that we explained [Victim's] previous history with vaginal cancer (which occurred about forty years ago and has since been completely resolved) and the fact that she was a former smoker. We did not disclose any history of hypertension as no history of hypertension ever existed. You accepted our membership on October 31, 2017 and collected contributions…in the amount of $233.00 per month. That amounts to $4,893.00 since your acceptance of our membership."

24

85.     Victim-3 did not include the cancer or smoking on her application because she had not been treated for the cancer for over 40 years and had ceased smoking over three years prior to the application.

86.     At the time of the victim's application, MCS Membership Guidelines stated the following policy:

> Once your membership is approved and you are an active Member, future medical bills for diagnosis or treatment of a pre-existing medical condition which existed prior to membership will be eligible for sharing as follows: **medical records indicate the diagnosis/condition has gone 36 continuous and consecutive months without signs, symptoms, treatment or medication. Final membership determination is made after a review of your medical records.** [Emphasis added]

87.     Victim-3 was not notified of any changes to the terms and conditions or policies of Medical Cost Sharing throughout her membership period.

88.     In the aforementioned letter, dated November 11, 2019, McGINNIS explained the claims process: "upon receiving the claim, we will run it through the system…Once the claim has been ran, it will be the member's responsibility to pay the allowed amount that will be shown on the Explanation of Sharing."

89.     On or about December 10, 2019, Victim-3 received the necessary claim document from her providers (UB-04) and forwarded it to MCS.  Victim-3 then received an Explanation of Sharing (hereinafter, EOS) from MCS with a "Process Date" of January 8, 2020, depicting billed charges of $69,051.12 and allowed charges of $19,782.00.  Contrary to MCS's claim, the charges were never negotiated down to $19,782.00 and remained at full cost.  To date, MCS has refused to "share" any of Victim-3's medical costs.

90.     It was not until Victim-3 hired a medical advocate that the hospital agreed to discount the $69,051.12 charge by $24,167.89, leaving a total balance of $44,883.23.  Currently,

Victim-3 still owes approximately $36,000 in total to all providers and is scheduled to make monthly payments of $533.00 to the hospital alone for the next seven years. To date, MCS has not "shared" the medical costs of Victim-3, although MCS reimbursed her membership fees of $4,893.

***VICTIM-4***

91. On or about January 1, 2020, Missouri-based Victim-4 became a member of MCS. According to the victim, she chose MCS because of the advertised promise "to cover pre-existing conditions from day one." Upon enrollment, Victim-4 understood that she had to meet a Personal Responsibility prior to MCS "sharing" any of her medical costs. Additionally, Vicitm-4 understood MCS would only cover the first $15,000 of pre-existing condition related expenses the first year.

92. Victim-4 filled out an online application and electronically signed a document for MCS. After she initially enrolled as an MCS "Diamond 5" member which carried a $250 monthly payment and a $5,000 Personal Responsibility, Victim-4 switched to the "Diamond" plan which carried a monthly payment of $150.00 and a Personal Responsibility of $10,000.00. [NOTE: The plan change occurred prior to the victim's claim explained below.] In total, Victim-4 paid approximately $2,250.00 in membership dues.

93. Victim-4 did not speak with anyone at MCS before enrolling in their program, was never called by anyone on behalf of MCS regarding her PEC nor did she ever receive brochures or informational packets from MCS. Prior to accepting Victim-4 as a member, MCS never asked Victim-4 to submit medical records from her medical providers to MCS nor did MCS ever contact her medical providers to obtain records on Victim-4's behalf.

26

94.     According to an MCS Pre-Existing Condition Form – which MCS required to be filed prior to acceptance of Victim-4's membership – Victim-4 listed all her known PECs and medications.  After completing and submitting the form, **Victim-4 was never informed by MCS that her specific PECs– or anything associated with those conditions** – would not be "shared" by MCS.

95.     On January 26, 2020, while on vacation, Victim-4 was suddenly stricken with the most severe headache she had ever experienced which caused her to vomit multiple times.  As a result, Victim-4 telephonically contacted the 24-hour nursing hotline promoted by and covered through her MCS membership.  After Victim-4 explained her situation, the nurse stated the ailment could be life threatening and instructed Victim-4 to go to the Emergency Room. On the instruction of the nurse, Victim-4 went to the Emergency Room where she was examined, provided medication and diagnosed with a severe migraine.

96.     For the next several months, Victim-4 required follow-up visits to several medical providers in order verify the underlying cause of the migraine was not life-threatening.  After her appointments, Victim-4 received bills for her medical care.  At first, Victim-4 ignored the bills as she believed MCS and the providers were "working out the details."   However, after a few months, Victim-4 realized the billed amounts reflected MCS had not "shared" any costs associated with her care and the bills remained at full price.

97.     Victim-4 said that after several of her claims were submitted to MCS, MCS became unresponsive.  Victim-4 attempted to contact MCS multiple times in order to receive Explanations of Sharing, however, her requests went unanswered until early June 2020.  On June 9, 2020, Victim-4 received an email from an MCS representative, via claims@mcsmedicalcostsharing.com, attached to which were three EOS.  The email stated:

27

Attached are the Explanation of Sharing documents from your recent ER visit on 1/26/2020. The providers have been mailed a copy also. Normally, this would not be an eligible shared expense as it was not a life-threatening visit. However, since we are a Christian organization and you were on vacation and unable to see your primary care physician, we have allowed it to go toward your personal responsibility. And, we have ran it through the reference base pricing to get you the best possible price for these claims.

98.     Victim-4 was confused as to why MCS would state that the costs were not "shared" due her ER visit "not being life-threatening."  Not a medical professional herself, and unaware of the cause of the sudden severe headache, Victim-4 followed the advice of the tele-nurse and went to the Emergency Room.[10]

99.     On June 9, 2020, Victim-4 replied to the email referenced above, "I called the nurses line/telemed on the card (not sure what it is called) and they told me that it could be life threatening and told me to go to the ER.  But even so, this would typically not be a shared expense or negotiated pricing?" MCS responded, "We will always run the claim to get the discounted amount for our member whether it is going to be eligible for sharing or not."

100.    According to MCS's May 2019 and October 2020 Membership Guidelines, "eligible Shared Services are provided for health care services that are provided to an active member in an Emergency. As defined in Federal legislation, the "prudent layperson" perception of what is an Emergency is used in determining Coverage under this Benefit. The use of emergency room services is only for injury or illness that, in the judgment of a reasonable person, is life-threatening."

101.    The Frequently Asked Questions section of the MCS website, as archived on February 21, 2019, and currently depicted, "ER visits will no longer be eligible for sharing

_____

[10] According to CDC guidelines, one of the "Signs of stroke in Men and Women" is a "sudden severe headache with no known cause."  Moreover, the CDC states that stroke is a leading cause of death in the United States and that someone dies of stroke every four minutes.

except in a life-threating situation.  If it is a life-threatening situation, the personal responsibility for emergency room will be $1000.00 in addition to your annual plan personal responsibility."

102.    Pursuant to MCS's policy terms, Victim-4's medical costs should have been "shared" — less her $10,000 Personal Responsibility plus an additional $1,000 ER Personal Responsibility.

103.    The EOSs attached to the June 9, 2020, email specifically stated that the medical care provided to Victim-4 was due to a PEC.  However, Victim-4 was never informed what PEC was identified by MCS that was used to decline coverage, nor was she informed why her EOSs depicted that *all* medical care provided was associated with a PEC.

104.    On June 10, 2020, one day after the email exchange, Victim-4 received a letter signed by McGINNIS stating she "had reached the maximum graded benefit amount for the calendar year."  Victim-4 did not understand what this meant as MCS had not paid anything towards Victim-4's medical care.  Victim-4 requested her insurance broker speak to MCS regarding the letter.  MCS told the broker the letter was correct and Victim-4 would not be receiving any further assistance for the matter.  The broker was then told to never call MCS again.

105.    On June 30, 2020, Victim-4 submitted a complaint to the MOAG with all details regarding the above ER visit and follow up medical care.  In a letter addressed to the MOAG, dated July 13, 2020, McGINNIS responded to the complaint.  Specifically, McGINNIS stated, "Regarding the claim which is a pre-existing condition.  As stated on our website and member's guide …For people with pre-existing conditions, the Diamond Plan and Diamond 5 Plan is a graded benefit:  First year benefit is as follows: The first $15,000 is ran through our RBP System.  Second year benefit is as follows: The first $30,000 is ran through our RBP System.

Case 4:22-sw-00724-MDH *SEALED* Document 1 Filed 08/22/22 Page 29 of 63

Third year benefit is as follows: The first $45,000 is ran through our RBP System…All pre-existing conditions must be disclosed.  Failure to disclose pre-existing conditions will result in only qualifying for the graded benefit Diamond Plan."  This explanation contradicts information provided to Victim-4.

106.    Victim-4 was provided a flier which contained a highlighted section that stated: "We cover pre-existing conditions from day one, including maternity.  Note:  pre-existing conditions on Diamond and Diamond 5 plans are graded benefits.  *Year 1 – per covered individual for all pre-existing conditions is $15,000 *Year 2 – total payout per covered individual = $30,000 *Year 3 – total payout per covered individual = $45,000 *Lifetime maximum of $45,000 per covered individual for all pre-existing conditions."

107.    In addition, on June 18, 2020, (one month before McGINNIS's letter to MOAG), *archive.org* archived MCS's website, specifically the "How It Works" page.  Accordingly, on June 18, 2020, MCS's website stated, "A pre-existing condition refers to any condition you had prior to requesting Medical Cost Sharing Membership.  For people with pre-existing conditions, the Diamond and Diamond 5 Plans are graded benefits. Example below:  First year total payout per covered individual is $15,000.  Second year total payout per covered individual is $30,000. Third year total payout per covered individual is $45,000."

108.    Finally, investigation did not find any record of MCS Membership Guidelines in which graded benefits were mentioned or defined, as McGinnis claimed in his letter to the MOAG, before October 2020.  Within the October 2020 MCS Membership Guidelines, MCS stated that effective August 1, 2020, MCS's PEC policy had changed to run all benefits through RBP without regard to a 'graded system'.

109. In approximately early September 2020, Victim-4 asked MCS for additional EOS. On September 10, 2020, an MCS representative, via claims@mcsmedicalcostsharing.com, forwarded Victim-4 the exact same June 9, 2020, email. No additional comments were made on the email. Victim-4 replied the same day, "I have already received these. Can you send all the others?"

110. In all, Victim-4 received approximately ten EOSs from MCS. The EOSs did not depict every claim submitted to MCS. On or about September 27, 2020, Victim-4 sent a letter to MCS requesting an explanation as to why MCS claimed, via the EOS, that she should be charged a significantly lower amount than the actual medical bills. MCS never responded to the letter.

111. By early-October 2020, Victim-4 had made multiple phone calls to MCS to no avail, submitted a complaint against MCS to MOAG, and had not received a response to her letter from MCS. Victim-4 came to the belief that MCS would not "share" any medical costs, and she sent an email to MCS requesting termination of her membership. Victim-4 received and signed a DocuSign document and formally canceled her membership. Overall, Victim-4 received a total of approximately $36,223.02 in medical bills while a member of MCS. To date, MCS has refused to "share" any of Victim-4's medical costs.

***VICTIM-5***

112. On or about January 1, 2020, Texas-based Victim-5 became a member of MCS. She chose MCS due to MCS's promise to cover childbirth immediately after becoming a member. Specifically, Victim-5 received an MCS brochure which highlighted "all pre-existing conditions, including maternity, are covered from day one!" After submitting her application, Victim-5 received a Pre-Existing Condition form from MCS, in which she was asked to list

Case 4:22-sw-00724-LPR-SEALED Document 1 Filed 08/22/08/22 Page 31 of 63

PECs, a primary care physician and current medications. On the form, the victim listed she was at 22 weeks gestation and she was taking prenatal vitamins.

113. Victim-5 chose MCS's "Diamond 5" individual plan which carried a monthly payment of $250.00 and a $5,000 Personal Responsibility (i.e. deductible). [Note: In June 2020, Victim-5 downgraded her membership to the "Premier plan, with a monthly payment of $65.00] In total, Victim-5 paid a total of approximately $1,695.00 in membership dues. MCS did not ask Victim-5 to submit documentation regarding her pregnancy prior to the birth of her child.

114. Victim-5 conducted multiple phone calls with MCS representative SILCOTT in which SILCOTT confirmed the birth would be covered by MCS as per the membership guidelines; wherein, MCS would "share" the cost of Victim-5's medical care after the $5,000 Personal Responsibility was met. According to notes kept by Victim-5, on March 6, 2020, SILCOTT informed the victim that "no pre-authorization was needed for hospital delivery" and that there was a "$15,000 benefit per year for pre-existing conditions and $50,000 for everything else."

115. In April 2020, Victim-5 gave birth to her child. Soon thereafter, Victim-5 began receiving hospital bills related to the birth. Per medical provider invoices and MCS-produced documents, the hospital charges totaled approximately $15,287.99 and physician's services totaled $8,059.00. After receiving these bills, Victim-5 called MCS to confirm MCS would be paying charges over her $5,000 personal responsibility, to which Victim-5 was told the claims were still in process.

116. For the next several months, Victim-5 made multiple phone calls to the hospital, physician's office, and MCS. Victim-5 was told by the hospital that MCS did not communicate with the hospital and did not attempt to negotiate the cost of medical care. When Victim-5 asked

32

SILCOTT about the lack of negotiation, SILCOTT responded "MCS does not negotiate with the hospitals, that's the patient's responsibility. MCS only runs prices through the RBP system."

117.    SILCOTT's denial that MCS negotiated with hospitals contradicted MCS policy. MCS Membership Guidelines dated August 2016, November 2017, October 2018, May 2019 and October 2020 all specifically state "in nearly all cases a pre-service discounted price can be worked out on the Members behalf…If pre-service notification approval is not obtained for scheduled/elected services, MCS will work to negotiate RBP [also called Value Based Payments or VBP] reimbursement."

118.    After multiple failed attempts to get MCS to "share" costs of medical service, Victim-5 decided to negotiate with the hospital herself. The hospital agreed to decrease her charges to non-insured, self-pay costs. As a result, the full hospital charges decreased from $15,287.99 to $6,272.76. Along with the cost of physician services, the total amount billed to Victim-5 equaled $14,331.76.

119.    On or about October 22, 2020, Victim-5 set up a phone call with SILCOTT and McGINNIS. On the phone call, McGINNIS told Victim-5 that MCS was denying all claims "because of her-pre-existing condition of pregnancy." McGINNIS's statement not only contradicted what was told to Victim-5 by SILCOTT on multiple occasions prior to the birth, but it also contradicted promotional brochures which specifically stated "all pre-existing conditions, including maternity, are covered from day one!" Moreover, according to archive.org, two months after the birth of Victim-5's child, on June 18, 2020, MCS's website stated policy in the "How It Works" page: "A pre-existing condition refers to any condition you had prior to requesting Medical Cost Sharing Membership. For people with pre-existing conditions, the Diamond and Diamond 5 Plans are graded benefits. Example below: First year total payout per covered

33

individual is $15,000.  Second year total payout per covered individual is $30,000.  Third year total payout per covered individual is $45,000."

120.    After the October 22, 2020, phone call, MCS sent Victim-5 a check for $50.65, dated October 23, 2020.  According to a letter from MCS accompanying the check, the check was for "an overage of $50.65 that you paid for your personal responsibility."

121.    On or about October 30, 2020, Victim-5 cancelled her MCS membership. Excluding the $50.65 check, MCS did not "share" any costs with Victim-5.  To date, Victim-5 has paid a portion of her hospital bills, out of pocket, but still owes approximately $9,000.00.

### *VICTIM-6*

122.    In or around January 2020, Missouri-based Victim-6 became a member of MCS, having chosen MCS because no other provider would cover maternity "from day one" as MCS had promised.  During the application process, Victim-6 received a brochure that stated "MCS is an ALL PROVIDER PLAN – you can see any provider!" and "Pre-existing conditions and maternity covered from day one."  Additionally, the brochure detailed, "We cover pre-existing conditions from day one, including maternity.  Note:  pre-existing conditions on Diamond and Diamond 5 plans are graded benefits.  *Year 1 – per covered individual for all pre-existing conditions is $15,000 *Year 2 – total payout per covered individual = $30,000 *Year 3 – total payout per covered individual = $45,000 *Lifetime maximum of $45,000 per covered individual for all pre-existing conditions."  Victim-6 chose MCS's "Diamond 5 Plus" family plan which carried a monthly payment of $550.00 and a $5,000 Personal Responsibility (i.e. deductible).  In total, Victim-6 paid approximately $4,400.00 in membership dues.

123.    In August 2020, Victim-6 gave birth to her child.  Following delivery, Victim-6 received bills from her providers.  Upon examination of the bills, she noticed MCS had not

34

covered any costs associated with the pregnancy and birth.  Victim-6 contacted her providers who informed her they sent claims to MCS and tried to contact MCS but MCS never responded.

124.    Victim-6 attempted to get an explanation from MCS, however, according to Victim-6, MCS exhibited "intentional vagueness" and was "non-responsive" to her outreach.  In return, Victim-6 contacted her hospital to obtain Form UB-04 (itemized medical bill) and provided the form to MCS in hopes that would spur action from MCS.

125.    Despite repeated attempts, MCS did not return Victim-6's phone calls.   In September 2020, due to MCS's refusal to respond, Victim-6 terminated her membership with MCS.  After termination of her membership, Victim-6 attempted to obtain payments from MCS to no avail.  In November 2020, Victim-6 ceased her attempts to get MCS to "share" her medical costs.

126.    To date, Victim-6 paid approximately $11,740.36, out of pocket for her medical bills.  MCS has not "shared" any of the cost associated with the birth.

*VICTIM-7*

127.    On or about February 1, 2020, Missouri-based Victim-7 became a member of MCS, having chosen MCS because of MCS's claim of covering pre-existing conditions "from day one."  Victim-7 stated he did not fill out the application for MCS and that it was completed online by his insurance broker.   After becoming a member, Victim-7 never received an informational packet or brochure from MCS regarding his coverage.

128.    Victim-7's chose MCS's family plan which carried a monthly payment of $550.00 and a $5,000 Personal Responsibility (i.e. deductible).   In total, Victim-7 paid approximately $1,100.00 in membership dues. Victim-7 stated for the first year of coverage, he

35

understood claims associated with pre-existing conditions had "a $15,000 cap" in that "MCS would pay $15,000 towards the overall bill" once his $5,000 Personal Responsibility was met.

129. On or about February 7, 2020, Victim-7 took his daughter to a specialist who performed an examination of a finger she had previously broken in early January 2020. The specialist informed Victim-7 that his daughter's injury necessitated surgery. Understanding he would have to obtain pre-authorization from MCS for the surgery, the victim requested the provider contact MCS that same day. The provider was unable to reach MCS. Consequently, the victim reached out to his insurance broker, who contacted MCS. The broker was able to get in contact with MCS, who told the broker MCS needed a letter from the medical provider stating the surgery was a medical necessity prior to MCS approving coverage. A letter was presumably sent by the provider to MCS. That same day, Victim-7 received a message from the broker that REYNOLDS had approved the procedure with a pre-existing condition cap of $15,000.

130. According to Victim-7, on or about February 10, 2020, MCS spoke with the provider approximately two more times to approve the procedure. According to Victim-7, again on February 12, 2020 (the date of the surgery), the provider telephonically contacted MCS for final authorization. MCS provided authorization for the procedure and the surgery was conducted. According to the victim, had MCS not provided pre-authorization, the surgery would not have occurred that day. Victim-7 expected to pay his $5,000 personal responsibility towards the surgery and believed, based on the pre-authorization, MCS would have "shared" the remaining costs.

131. In approximately April or May 2020, Victim-7 received medical bills which showed MCS had not "shared" any amount of the bill and that he was charged full cost of the procedure. In all, medical bills for the surgery totaled approximately $16,465.86. After

receiving the medical bills, Victim-7 attempted to contact MCS four or five times, stating he "left messages but never received return calls." To date, Victim-7 has paid approximately $2,500.00 out of pocket. The bills issued by the providers reflect no evidence of negotiation by MCS and charged the full amount for the surgery as aforementioned.

132. On December 7, 2021, Victim-7 sent an email to claims@mcsmedicalcostsharing.com regarding his situation. On December 8, 2021, an unknown individual responded to Victim-7 using the above MCS email address. The response stated:

> This injury was an undisclosed pre-existing condition (see timeframe below) which would not qualify for sharing benefits. It was not listed on your electronic document at sign up. However, we are a Christian organization and ran this through the reference-based pricing program as a courtesy to you. As this was a pre-existing condition - the injury happened on 1/19/2020 and was before your membership with MCS which began on 2/1/2020 (and ended on 3/31/2020) - it fell into the pre-existing graded benefit plan. The graded benefit plan meant that we would run up to $15,000 in medical claims. Once you reached the full graded benefit amount of $15,000, your benefit maximum was reached. You reached that with the first claim that was sent in that was for $16,465.86. $4,330.46 was the allowed amount for this claim per the MCS plan, and that went toward your personal responsibility. However, as stated before, you reached the maximum benefit for this member per our plan guidelines. The EOS was mailed out to the provider and emailed to you. They are attached to this email. We also, until now, have had no correspondence from you, nor have any messages been left or you would have received a call back. MCS has done our part according to our plan guidelines.

133. On December 9, 2021, Victim-7 sent an email responding to MCS. MCS, via claims@mcsmedicalcostsharing.com, responded on December 10, 2021, stating:

> As was stated in our previous email, your membership began on 2/1/2020 and ended on 3/31/2020. The finger injury happened on 1/19/2020, which predated your MCS membership. That meant that it fell into the pre-existing graded benefit plan. MCS knew of the date of the injury once we received [daughter's] medical records. It was not disclosed on your electronically signed document where you were to list all pre-existing conditions. That made it an undisclosed pre-existing condition. Full disclosure of all pre-existing conditions is an MCS requirement for membership. We approved the surgery for reference-based pricing using the

37

pre-existing condition guidelines, any and all repricing amounts are the responsibility of the member. The billed amount was $16,465.86. The repriced amount was $4,330.46, and your savings by virtue of your membership was $12,135.40, and is exactly how the program is supposed to work. We actually did let the allowed amount go toward your personal responsibility amount. Your personal responsibility annual amount was $5,000.00. The allowed charges did not meet your personal responsibility amount, but the claim exceeded the $15,000 benefit maximum. Per your statement, this was an elective surgery and not a necessary one. You stated that you "would not have done the surgery otherwise." For that reason alone it would not have been eligible for sharing. We ran this claim through the referenced-based pricing system as a courtesy to you and even allowed it to go toward your personal responsibility.

134. Contrary to MCS responses, according to the victim, Victim-7 not only notified MCS of the broken finger prior to surgery, MCS had given pre-authorization to conduct the surgery. In terms of the "graded benefit" and MCS "doing their part according to our plan guidelines," at no time did MCS define a "graded benefit" to their customers within their guidelines (see paragraphs 56–57 above).

135. Victim-7 stated he had never received an EOS until the email dated December 8, 2021. The EOS received by Victim-7 depicted that the full amount charged to Victim-7 was $16,465.86, and that the RBP system had "re-priced the amount" to $4,330.46, as stated in the above email.

136. However, records produced by Context 4 Healthcare reveal that MCS never ran the claim as depicted in the email and EOS. MCS processed Claim #37176042 through Context 4 Healthcare which included two billed charges: one charge for $131.00 and a second for $10,889.00. The "re-priced" amount for these two charges reflected $4,330.46. In addition, MCS processed Claim #37853847 through Context 4 Healthcare which included five billed charges: $645.00; $189.00; $880.00; $4,544.00 and $189.00. The "re-priced" amount for these charges reflected $1,933.55.

137.     Had MCS included the extra $1,933.55 in his total "re-priced" claims, Victim-7 would have exceeded his $5,000.00 Personal Responsibility.  Thereby, MCS would have had to "share" approximately $1,264.01 of Victim-7's medical costs.  However, by only including the first claim's "re-priced" amount of $4,330.46, MCS depicted that Victim-7 did not meet his annual Personal Responsibility and, therefore, MCS owed nothing to Victim-7.

138.     Because MCS did not negotiate with the health care provider, Victim-7's claims were never re-priced and Victim-7 did not save $12,135.40 "by virtue of his membership."

139.     Finally, contrary to MCS's claim that this surgery was "elective," as aforementioned, MCS required a letter of necessity for the surgery from the provider prior to giving MCS's pre-authorization.  According to Victim-7, the provider deemed the surgery a medical necessity as was told to MCS prior to surgery.

140.     Before the response of the December 2021 emails, MCS stopped responding to Victim-7 for a period of around one and a half years.  After not receiving a response from MCS and contracting new insurance coverage, Victim-7 terminated his membership on approximately April 1, 2020.

141.     To date, Victim-7 owes the full-billed cost of procedures to his daughter's medical providers.  MCS has not "shared" any of the medical costs charged to Victim-7.

**<u>Failure to "Share" Medical Costs as Advertised</u>**

142.     Throughout the scheme, REYNOLDS and McGINNIS used MCS's IRS recognized 501(c)(3) designation and "Health Care Sharing Ministry" to promote MCS.  In promotional materials and on the MCS website, as well as applications to the IRS for 501(c)(3) designation, MCS promised to pay so long as a member's medical claim was validated.  Yet,

39

investigation found MCS repeatedly failed to "share" medical expenses as promoted and promised.

143.    Between December 2015 and May 2022, MCS used only a fraction of the MCS membership dues to "share" medical costs.  Financial analysis revealed, at times, MCS did not have enough funds in their accounts to cover medical claims submitted by members, as REYNOLDS and McGINNIS had depleted MCS accounts.  The below chart details the total membership dues collected and the claims paid per year.

| Year | Total Dues Collected | Claims Paid Within Specified Year | Percentage |
|------|----------------------|-----------------------------------|------------|
| 2015 | $34,318.13 | $0 | 0.00% |
| 2016 | $902,073.36 | $2,056.00 | 0.23% |
| 2017 | $1,427,394.96 | $40,715.21 | 2.85% |
| 2018 | $1,960,523.70 | $101,822.35 | 5.19% |
| 2019 | $1,296,409.65 | $72,261.12 | 5.57% |
| 2020 | $1,070,402.91 | $24,517.64 | 2.29% |
| 2021 | $685,270.54 | $4,610.52 | 0.67% |
| January - May 2022 | $173,125.56 | $0 | 0.00% |
| **TOTAL** | **$7,549,518.81** | **$245,982.84** | **3.26%** |

144.    From approximately November 2016 to January 2019, MCS utilized Hawaii Mainland Administrators (hereinafter, HMA) – a third-party business – to manage, among other services, the claims filed by MCS members.[11]  According to HMA records, throughout the entire period HMA was contracted by MCS, billed medical services for MCS members totaled

---

[11] HMA was contracted to assist MCS from June 2016 to January 2019.  However, records provided by HMA reflected claims were managed HMA for the period November 2016 to January 2019.  As a result, the total number of claims filed with MCS prior to and after the claim management period remain unknown to the FBI.

40

approximately $2,565,857.39. Although HMA managed claims, MCS maintained the sole authority to approve or deny payment of all submitted medical claims.[12]

145.    Investigation found, that from inception to April 30, 2018, MCS "shared" costs associated with "preventive care services." However, according to MCS policy, "effective April 30, 2018, all preventive care will be a shared expense and will go toward [MCS member's] Personal Responsibility. The maximum amount allowed for preventive care is $1,000.00 per covered individual, per plan year." Once MCS enacted this limited "sharing" of preventive care costs, MCS "sharing" overall diminished significantly.

146.    According to MCS financial records and records provided by HMA, MCS "shared" approximately $145,901.13 in medical costs for medical services provided between November 2016 and April 30, 2018. These same records reveal most "shared" expenses were indeed for preventive care services. However, beginning on May 1, 2018, MCS ceased preventive care payments.

147.    Between May 1, 2018, and May 2022, MCS received at least $4,471,994.20 in membership contributions. However, for medical services provided in that same period, MCS "shared" a total of approximately $88,825.75 towards expenses for eleven MCS members and five medical providers (2.0%).

148.    The "shared" funds paid to the five medical providers do not indicate which MCS member benefited. However, a total of $4,020.44 was paid to four of the providers – all four of which are located in the vicinity of the REYNOLDS residence – through a debit card registered to MCS accounts where only REYNOLDS and LANA had signature authority.

---

[12] On October 8, 2018, SILCOTT, using email address eva@mcsmedicalcostsharing.com, emailed HMA representatives stating "We at MCS, are the only ones who make that decision. All claims, prior authorizations, and medical records come to us for review, and then we let you know if something is approved or not."

149.    REYNOLDS and McGINNIS often promoted MCS as a non-profit corporation "operated solely for religious and charitable purposes," formed to serve "like-minded people who rely on each other to pay their medical bills." Yet, from inception to May 31, 2022, MCS utilized a grand total of approximately $245,982.84 – equal to only 3.26% of membership contributions collected – to "share" medical costs.

**REYNOLDS and McGINNIS Use of MCS Funds**

150.    Between December 2015 and May 2022, MCS collected at least $7,549,518.81 in membership dues.    REYNOLDS and McGINNIS, in a manner inconsistent with the organization's public representations and strictly against the 501(c)(3) inurement clause, appropriated a significant percentage of the membership contributions for their personal enrichment and benefit.[13]

151.    From December 2015 through May 2022, MCS "shared" a total of approximately $245,982.84.  In comparison, REYNOLDS and McGINNIS pocketed at least $4,111,926.02 or 54.5% of membership contributions.[14]    Additionally, investigation revealed a majority of the remaining membership contributions were used by REYNOLDS and McGINNIS to either perpetuate their scheme or were utilized in a questionable manner as outlined below.[15]

---

[13] According to the IRS inurement clause, a section 501(c)(3) organization must not be organized or operated for the benefit of private interests, such as the creator or the creator's family, shareholders of the organization, other designated individuals, or persons controlled directly or indirectly by such private interests.  No part of the net earnings of a section 501(c)(3) may inure to the benefit of any private shareholder or individual.  A private shareholder or individual is a person having a personal and private interest in the activities of the organization.

[14] This total includes cash withdrawals of approximately $560,350.00.  Craig and Lana Reynolds were the only signers on all accounts where cash was withdrawn.

[15] The two charts of this section do not account for all remaining funds collected by MCS. Dollar amounts are approximate. At least $882,954.98 of this total was paid – utilizing MCS membership dues - to a man who resides in or around Beirut, Lebanon.  According to

42

152.    According to financial analysis, between December 2015 and May 2022, REYNOLDS and McGINNIS utilized funds to perpetuate the scheme as follows:

| Payment Entity | Amount |
| --- | --- |
| Website Development, Maintenance and Marketing | $1,099,507.35 |
| Third Party Administrator and Vendor Fees | $402,214.82 |
| Payroll (not including REYNOLDS and McGINNIS) | $303,125.03 |
| Rent/Utilities/Internet/Communications Bills | $221,725.19 |
| Attorney/Accountant Fees | $79,573.35 |
| GRAND TOTAL | $2,106,145.74 |

153.    Finally, according to financial records, between December 2015 and May 2022, REYNOLDS and/or LANA spent at least $195,003.59 in various other questionable expenses directly from MCS funds.[16] The below chart breaks down the expenditures:

| Payment Entity | Amount |
| --- | --- |
| Personal Vehicle Payments/Insurance/Parts | $    (60,680.66) |
| Gas Stations/Convenience Stores | $    (34,109.07) |
| Restaurants/Grocery Stores | $    (23,666.33) |
| Entertainment/Concert Tickets | $    (14,408.33) |
| Best Buy | $    (10,049.52) |
| US Department of Treasury | $    (7,350.00) |
| Limousine Service | $    (5,590.00) |
| Car Washes | $    (5,299.37) |
| Sam's Club | $    (4,866.97) |
| Leibowitz Menswear | $    (2,879.08) |
| Harley Davidson/Motorcycle Shops | $    (2,867.85) |
| Walmart | $    (2,509.42) |
| Walgreens/CVS | $    (2,442.48) |
| Mexico Vacation | $    (2,373.05) |
| Kirklands/Hobby Lobby/Wayfair/Gordmans | $    (2,326.92) |
| Big Lots/Comfort Center | $    (1,653.62) |
| A Garage Door | $    (1,650.00) |

REYNOLDS, the individual designed and maintains the MCS website and assists with "advertising" for MCS.  Per an FBI interview of REYNOLDS, this man also works on "for-profit" projects for REYNOLDS.

[16] According to financial records, only REYNOLDS and LANA had signature authority and access to all MCS financial accounts included in funds represented in the chart.

43

| | | |
|---|---|---|
| NextGen Male Medical Supplements | $ | (1,303.25) |
| BuyGoods.com | $ | (1,301.60) |
| Ring Camera | $ | (1,220.81) |
| Ambetter Health Insurance | $ | (1,127.88) |
| NordicTrack.com | $ | (1,085.91) |
| Menards/Lowes/Harbor Freight/Orscheln/Westlake | $ | (998.75) |
| Coach/Sunglass Hut/Bath and Body Works | $ | (875.26) |
| Liquor and Tobacco Shops | $ | (854.24) |
| First American Title | $ | (519.14) |
| Donald J Trump Political Action Committee[17] | $ | (300.00) |
| Dillards/TJ Maxx/Dollar General/Family Dollar | $ | (296.00) |
| Sirius XM Radio | $ | (273.08) |
| TrafficLaw45Bucks.com | $ | (125.00) |
| **GRAND TOTAL** | **$** | **(195,003.59)** |

### Rise-Up Marketing LLC

154.    In addition to paying himself directly through MCS financial accounts, REYNOLDS set up a company, Rise-Up Marketing LLC (RUML), to collect further payments from third-party payment administrators. The administrators were hired by MCS to collect MCS membership dues and use the dues to pay legitimate vendors for services utilized by MCS.

155.    Beginning in October 2016, REYNOLDS had the administrators pay RUML for "administrative fees" and "commission" allegedly owed to REYNOLDS for enlisting new MCS members. However, at the same time, REYNOLDS was collecting payments from MCS for this same duty. Investigation indicates RUML conducted no other business outside of collecting these "fees" from third-party administrators.

---

[17] Under the Internal Revenue Code, "all section 501(c)(3) organizations are absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of (or in opposition to) any candidate for elective public office. Contributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office violate the prohibition against political campaign activity."

44

156.     Although the funds received by RUML were drawn *directly* from MCS membership dues, the monies deposited into the RUML account were not reported to the IRS via MCS's filed IRS Form 990s and, thereby, were concealed from the IRS and the general public.

157.     Between July 2016 and December 2021, RUML received deposits totaling $130,809.37.  Of the deposited funds, at least $103,152.41 was transferred to other personal and for-profit business accounts owned or controlled by REYNOLDS.   In addition to the transferred funds, the RUML account was utilized by REYNOLDS to pay off a personal credit card, vehicle loans, cash withdrawals and other personal expenses. Just $5,000.00 from this account was transferred to MCS business accounts and used for MCS business.

### FILING OF FALSE IRS FORM 990s

158.     MCS utilized false IRS Form 990s to further perpetuate the fraudulent representation of MCS as a "non-profit" organization, "operated solely for religious and charitable purposes" by concealing the actual amount of membership dues paid into financial accounts controlled by REYNOLDS and McGINNIS.

159.     According to the IRS website, "some members of the public rely on Form 990 or Form 990-EZ as their primary or sole source of information about a particular organization. How the public perceives an organization in such cases can be determined by information presented on its return." IRS Forms 990 are accessible online to the public.

160.     For tax years 2016 through 2019, MCS submitted false IRS Forms 990 to the IRS by misrepresenting compensation amounts for REYNOLDS and McGINNIS.   As per IRS regulations, MCS's IRS Form 990s were drafted by a private accounting firm using information provided by REYNOLDS. Before filing each form, REYNOLDS signed and certified "Under penalties of perjury, I declare that I have examined this return, including accompanying

45

schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete."

161.    According to MCS's 2016 IRS Form 990, under Part VII: *"Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees and Independent Contractors"* both REYNOLDS and McGINNIS declared $0.00 in compensation.  However, a review of MCS financial accounts throughout 2016 identified at least $196,819.38 transferred from MCS accounts to accounts owned or controlled by REYNOLDS.  Additionally, the review identified at least $178,350.00 transferred from MCS accounts to accounts owned or controlled by McGINNIS in 2016.  In total, REYNOLDS and McGINNIS received at least $375,169.38 more than indicated on the MCS 2016 Form 990.

162.    According to MCS's 2017 IRS Form 990, REYNOLDS and McGINNIS declared compensation of $458,500.00 and $406,400.00, respectively.  A review of MCS financial accounts throughout 2017 identified at least $538,652.41 transferred from MCS accounts to accounts owned or controlled by REYNOLDS.  Additionally, the review identified at least $417,870.00 transferred from MCS accounts to accounts owned or controlled by McGINNIS throughout 2017.  In total, REYNOLDS and McGINNIS received at least $91,622.41 more than indicated on the MCS 2017 Form 990.

163.    According to MCS's 2018 IRS Form 990, REYNOLDS and McGINNIS declared compensation of $597,000.00 and $381,500.00, respectively.  A review of MCS financial accounts throughout 2018 identified at least $679,900.00 transferred from MCS accounts to accounts owned or controlled by REYNOLDS.  Additionally, the review identified at least $401,000.00 transferred from MCS accounts to accounts owned or controlled by McGINNIS

46

throughout 2018. In total, REYNOLDS and McGINNIS received at least $102,400.00 more than what was indicated on the MCS 2018 FD-990.

164. In the process of filing MCS's 2018 IRS Form 990, REYNOLDS submitted documents and bank statements to the accounting firm with hand-written descriptions of all debits made on the account. Using the descriptions as submitted, accountants compiled an "Income Statement" which reflected Officer Payroll/Management Fees/Other Payroll totaling $1,320,901.12.

165. On November 6, 2019, an employee of the accounting firm emailed REYNOLDS (via craigareynolds@yahoo.com) stating "attached is the draft of the 2018 Form 990 for Medical Cost Sharing based on the bank statements you provided. Please review and let us know if you have any questions or concerns before we finalize." On November 7, 2019, REYNOLDS via the same email address responded, "the only concern I have is the amount of income that is shown. I know Jim made a lot less then [sic.] that in 2018. It was around $440,000 my 2018 Tax return was $597,000." The same day the accounting firm responded "Ok, I'll show those amounts for you two and move the remaining to other salaries." REYNOLDS then responded "sorry for the confusion but Jim's total from MCS is $381,500.00."

166. According to bank records and records provided by MCS's payroll processing company, throughout Tax Year 2018, outside of REYNOLDS and McGINNIS, MCS only employed five other individuals whose combined payments totaled only $55,864.00. SILCOTT was the sole employee – in addition to REYNOLDS and McGINNIS – who was employed the entire year.

167. According to MCS's 2019 IRS Form 990, REYNOLDS and McGINNIS declared compensation of $192,000.00 and $178,894.00, respectively. A review of MCS financial

47

accounts throughout 2019 identified at least $355,500.00 transferred from MCS accounts to accounts owned or controlled by REYNOLDS. Additionally, the review identified approximately $187,662.31 transferred from MCS accounts to accounts owned or controlled by McGINNIS throughout 2019. In total, REYNOLDS and McGINNIS received at least $172,268.31 more than indicated on the MCS 2017 FD-990.

168. Collectively, REYNOLDS and McGINNIS received at least $741,460.10 more than what was reported on MCS's FD-990s for tax years 2016 through 2019. On or about February 15, 2021, MCS filed IRS Form 8868 "Application for Automatic Extension of Time to File an Exempt Organization Return" to request an extension to file their Tax year 2020 IRS Form 990. MCS was granted an extension until November 15, 2021. As of October 26, 2022, MCS has failed to file their 2020 Form 990.

***EXPENDITURE OF MEMBERSHIP DUES IN 2022***

169. Between January 1, 2022, and May 31, 2022, MCS collected at least $182,625.56 in membership dues. In the same time frame, approximately $11,100 was withdrawn from MCS accounts in cash (the only individuals with signature authority for the account are LANA and REYNOLDS), approximately $20,000 was paid to an account controlled by McGINNIS, approximately $20,993.23 was paid to Payroll Services (a company utilized by MCS to pay SILCOTT), and approximately $74,505.56 was paid to accounts controlled by REYNOLDS. Additionally, REYNOLDS utilized $631.76 from MCS accounts to pay for online services for REYNOLDS' for-profit businesses.

170. In total, between January 1, 2022 and May 31, 2022, REYNOLDS, McGINNIS and SILCOTT transferred an approximate total of $127,230.55 of the incoming membership

48

dues directly into financial accounts owned or controlled by REYNOLDS, McGINNIS and SILCOTT. Almost all remaining funds were utilized to further perpetuate the scheme to defraud.

## SUMMARY OF MOVEMENT OF SCHEME PROCEEDS

171. MCS members made monthly payments to MCS via one of four third-party payment processors: PayPal, CSG Forte Payment ("Forte"), Stripe, and Hawaii Mainland Administrators (HMA). The FBI has determined from subpoenas to various financial institutions that the funds collected through payment processors were in turn directed to one of at least six checking accounts controlled by REYNOLDS and MCGINNIS, five of which were directly owned by MCS.

| Institution Account# Account Type | Account Owner(s) | Signature Authority | Directly Traceable Proceeds of Fraudulent Scheme | Account Status |
|---|---|---|---|---|
| Bank Midwest<br>-<br>#▆▆▆1239<br>-<br>Non-Profit Checking | Medical Cost Sharing Inc. | Craig & Lana Reynolds | $330,084.79<br>(12/01/15 – 6/06/16) | Closed June 2016 |
| Commerce Bank<br>-<br>#▆▆▆0609<br>-<br>Non-profit Checking | Medical Cost Sharing Inc. | Craig & Lana Reynolds | $5,780,32.86<br>(05/25/16 – 08/05/21) | Closed August 2021 |
| Commerce Bank<br>-<br>#▆▆▆6749<br>-<br>Non-profit Checking | Medical Cost Sharing Inc. | Craig & Lana Reynolds | $926,317.60<br>(07/04/18 – 08/03/21) | Closed August 2021 |
| Commerce Bank<br>-<br>#▆▆▆9147<br>-<br>Business Checking | Rise Up Marketing, LLC | Craig & Lana Reynolds | $91,966.26 | Closed August 2021 |
| BMO Harris<br>-<br>#▆▆▆1715<br>-<br>Non-Profit Checking | Medical Cost Sharing, Inc. | Craig & Lana Reynolds | $321,158.43 | $1,400.22<br>(as of 11/23/2022) |
| BMO Harris<br>-<br>#▆▆▆1723<br>-<br>Non-Profit Checking | Medical Cost Sharing, Inc. | Craig & Lana Reynolds | $99,670.87 | $536.39<br>(as of 11/23/2022) |

49

*Figure 1*



172.    The proceeds of the wire fraud held in the five MCS non-profit checking accounts were in turn transferred to other for-profit financial accounts owned or controlled by REYNOLDS and MCGINNIS and/or used by REYNOLDS and McGINNIS to purchase or make payments on a variety of goods, services and real property, including mortgage payments on a home owned by REYNOLDS and on a home owned by REYNOLDS and LANA.[18] Additionally, the funds from certain of the accounts were used to make payments on the three

_____
[18] The Government does not seek to seize real property but anticipates filing a civil forfeiture action against any real property traceable to fraud proceeds or involved in money laundering activity in a civil complaint.

Subject Property vehicles listed below, which the government seeks to seize through its seizure

warrant application.

| SUBJECT VEHICLES | | |
|---|---|---|
| **VIN** | **Description** | **Asset Holder** |
| 1HD1TCL16NB951086 | 2022 Harley Davidson Motorcycle | Craig Reynolds |
| 5LMJJ2LT1LEL12024 | 2020 Lincoln Navigator | Lana Reynolds |
| 1FT7W2B69MEC53417 | 2021 Ford F-250 Platinum | James McGinnis |

173.    The investigation has located at least five accounts owned or operated by

REYNOLDS and MCGINNIS that obtained transfers of funds from the aforementioned accounts

receiving victim payments from the third-party processors:

| Institution Account# Account Type | Account Owner(s) | Signature Authority | Directly Traceable Proceeds of Fraudulent Scheme | Account Status |
|---|---|---|---|---|
| Bank Midwest - #■■3576 - Personal Checking | Craig & Lana Reynolds | Craig & Lana Reynolds | $13,564.38 (12/18/15 – 06/14/16) | Closed June 2016 |
| Commerce Bank - #■■2117 - Business Checking | Craig Reynolds | Craig & Lana Reynolds | $710,906.90 (05/27/16 – 08/19/21) | Closed June 2022 |
| Commerce Bank - #■■2460 - Personal Checking | Craig & Lana Reynolds | Craig & Lana Reynolds | $559,752.41 (01/01/17 – 08/16/21) | Closed September 2021 |
| Commerce Bank - #■■7835 - Business Checking | Shining Light Inc. | James & Keesha McGinnis | $986,965.35 (10/28/16 – 08/09/21) | Closed August 2021 |
| BMO Harris Bank - #■■6937 - Personal Checking | Craig Reynolds | Craig & Lana Reynolds | $261,698.66 (07/16/21 – 05/31/22) | $11,717.25 (as of 11/23/2022) |

174.    Transfers of proceeds of the fraudulent scheme between accounts owned or

controlled by REYNOLDS and McGINNIS exceeded $10,000 on numerous occasions. For

51

example, between June 2017 and January 2019, $410,500 was transferred to the Commerce Bank account ending in -2117 from the Commerce Bank account ending in -0609 through 29 funds transfers exceeding $10,000.

175.    The investigation has located de minimus sources of revenue for MCS beyond the funds paid by MCS members. A review of MCS financial accounts shows that between December 2015 and May 2022, MCS received only approximately $25,000 in funds from sources other than MCS members (versus the over $7 million collected from MCS member payments).[19]

## PROBABLE CAUSE THAT THE BMO HARRIS ACCOUNT ENDING IN -6937 CONTAINS PROCEEDS OF FRAUD

176.    There is probable cause to believe BMO Harris N.A. checking account number ███6937 (the "BMO Account"), held in the name of Craig Reynolds, contains funds directly traceable to fraud proceeds and that the account was involved in money laundering activity.

177.    The BMO Account was opened in July 2021, in the name of Craig A Reynolds Inc. The signature card for the account lists Craig A. Reynolds and Lana K. Reynolds as holding signature authority.  An analysis of the account activities from July 16, 2021, to May 31, 2022, reveals deposits of $606,994.79, of which at least **$293,698.66** have thus far been identified as direct proceeds of the fraudulent scheme.

178.    There is probable cause to believe that the transfers of proceeds of the fraudulent scheme from MCS non-profit business accounts into REYNOLDS' personal BMO Account were made in order to conceal or disguise the nature and source of the funds.

---

[19] This "outside" income includes, *inter alia*, transfers of funds from other MCS accounts, cash deposits, payments from insurance companies, and a $926.40 check from the United States treasury. The investigation has not traced these outside income funds payments to any legitimate business enterprise of MCS.

179.    As of November 23, 2022, the balance on the BMO Account was $11,717.25.

180.    Figure 2 below provides a summary of presently known funds transfers from

MCS members/victims to the BMO Account

*Figure 2*



**PROBABLE CAUSE THAT THE THREE SUBJECT PROPERTY VEHICLES
INVOLVE PROCEEDS OF FRAUD**

**2020 Lincoln Navigator, VIN: 5LMJJ2LT1LEL12024**

181.    On or about August 11, 2020, LANA purchased a **2020 Lincoln Navigator, VIN:
5LMJJ2LT1LEL12024**, from Anderson of St. Joseph for approximately $89,913.00. As part of

the purchase, LANA received a trade-in allowance of $54,500.00 for a 2019 Ford F-150, VIN

1FTEW1EG7KFA35456. The remaining balance was financed with BMO. Title Record

Information obtained from the Missouri Department of Revenue identifies the **2020 Lincoln**

Case 4:23-sw-00724-LMC Document 4 Filed 12/08/22 Page 53 of 63

**Navigator, VIN: 5LMJJ2LT1LEL12024**, as registered in the name of Lana Reynolds located at 116 Ridge Drive, Saint Joseph, MO 64506.

182.    On or about October 20, 2020, the first payment was made to BMO. Between the first payment and May 27, 2022, total payments of approximately $27,982.80 were made on the vehicle from REYNOLDS' personal bank accounts:

| Account | Bank | Payments Made |
|---|---|---|
| 2117 | Commerce Bank | $14,016.40 |
| 6937 | BMO Harris Bank N.A. | $13,966.40 |

183.    A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2022 Lincoln Navigator from these accounts are traceable to proceeds of the fraud and/or to proceeds involved in money laundering activity.

184.    The value of the trade-in vehicle is likewise traceable to fraud proceeds. The lien on the 2019 Ford F-150 was paid down using proceeds of the fraudulent scheme. Between May 9, 2019, and the August 2020 trade-in date, total payments of approximately $19,448.85 were made on the 2019 Ford F-150 lien from accounts with funds traced directly to MCS revenue, including funds paid from MCS non-profit business checking accounts:

| Account | Bank | Payments Made |
|---|---|---|
| 2117 | Commerce Bank | $17,156.90 |
| 6749 | Commerce Bank | $1,148.95 |
| 0609 | Commerce Bank | $1,143.00 |

185.    A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2019 Ford F-150 were traceable to proceeds of the fraud and/or were traceable to proceeds involved in money laundering activity.

186.    The 2019 Ford F-150 was purchased using a trade-in allowance of $23,500.00 for a 2014 Ford F-150, VIN 1FTFW1ET4EFC08064. As with the 2022 Navigator and 2019 F-150,

the lien on the 2014 Ford F-150 was paid using proceeds of the fraudulent scheme. Between April 8, 2016, and March 11, 2019, total payments of approximately $21,951.21 were made on the 2014 Ford F-150 from accounts with funds traced directly to proceeds of the fraudulent scheme, including funds paid from a MCS non-profit business checking account:

| Account | Bank | Payments Made |
|---------|------|---------------|
| 2117 | Commerce Bank | $20,161.88 |
| 1239 | Bank Midwest | $1,789.33 |

187.    A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2014 Ford F-150 were traceable to proceeds of the fraud and/or were traceable to proceeds involved in money laundering activity.

188.    Figure 3 below illustrates the flow of fraudulent MCS proceeds to the 2020 Lincoln Navigator.

*Figure 3*



Case 4:22-cv-00727-SEAL Document 1 Filed 08/22/22 Page 55 of 63

**2022 Harley Davidson Motorcycle, VIN: 1HD1TCL16NB951086**

189.    On or about March 11, 2022, CRAIG REYNOLDS purchased a **2022 Harley Davidson Motorcycle, VIN: 1HD1TCL16NB951086**, from St. Joseph Motorcycle Co., Inc. dba St. Joe Harley-Davidson for approximately $50,857.85. Title Record Information identifies the **2022 Harley Davidson Motorcycle, VIN: 1HD1TCL16NB951086**, as registered in the name of CRAIG REYNOLDS and located at 116 Ridge Drive, Saint Joseph, MO 64506.

190.    As part of the purchase, REYNOLDS received a trade-in allowance of $24,000.00 for a 2016 Harley Davidson Motorcycle, VIN 1HD1PXN13GB960937. Trade-in funds from the 2016 Harley Davidson Motorcycle are directly traceable to MCS member payments.

191.    REYNOLDS made total payments on the 2016 Harley Davidson of approximately $32,655.13 from REYNOLDS's personal accounts and from a MCS non-profit business checking account:

| Account | Bank | Payments Made |
|---|---|---|
| ███ 2117 | Commerce Bank | $26,319.06 |
| ███ 6937 | BMO Harris Bank N.A. | $3,899.12 |
| ███ 0609 | Commerce Bank | $974.78 |
| ███ 2460 | Commerce Bank | $974.78 |
| ███ 3576 | Bank Midwest | $487.39 |
| **TOTAL** | | **$32,655.13** |

192.    A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2016 Harley Davidson Motorcycle were traceable to proceeds of the fraud and/or were traceable to proceeds involved in money laundering activity.

193.    Figure 4 below illustrates the flow of fraudulent MCS proceeds to the 2022 Harley Davidson.

56

*Figure 4*



## 2021 Ford F-250, VIN: 1FT7W2B69MEC53417

194.     On or about December 23, 2020, McGINNIS purchased a **2021 Ford F-250, VIN: 1FT7W2B69MEC53417**, from Anderson Ford of St. Joseph for approximately $67,623.04. As part of the purchase, McGINNIS received a trade-in allowance of $54,000.00 for a 2019 Ford F-150, VIN 1FT7W2B64KEE83248. The Ford Motor Credit Company holds a lien on captioned vehicle.

195.     Title Record Information identifies the **2021 Ford F-250, VIN: 1FT7W2B69MEC53417**, as registered in the name of JAMES L MCGINNIS and located at 4014 Robinhood Drive, St. Joseph, MO 64503.

Case 4:23-sw-00574-LMC -SEALED Document 1 Filed 08/22/22 Page 57 of 63

196.     Between March 30, 2021, and July 21, 2021, McGINNIS made total lien payments of approximately $5,004.00 from a business checking account registered to "Shining Light, Inc.":

| Account | Bank | Payments Made |
|---------|------|---------------|
| ███7835 | Commerce Bank | $5,004.00 |

197.     The Shining Light Inc., Commerce Bank account ending in -7835 was funded using proceeds of the fraudulent scheme, including through at least two transfers of funds exceeding $10,000 from the MCS non-profit business checking account ending in -0609, in violation of 18 U.S.C. § 1957.

198.     A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2021 Ford F-250 were traceable to proceeds of the fraud and/or traceable to proceeds involved in money laundering activity.

199.     The lien on the 2019 Ford F-150 trade-vehicle was paid down using proceeds of the fraudulent scheme. Between June 6, 2019, and December 14, 2020, McGINNIS made total payments on the 2019 Ford F-150 lien of approximately $19,636.99 from the same Shining Light, Inc., account:

| Account | Bank | Payments Made |
|---------|------|---------------|
| ███7835 | Commerce Bank | $19,636.99 |

200.     A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2019 Ford F-150 were traceable to proceeds of the fraud and/or traceable to proceeds involved in money laundering activity.

201.     The 2019 Ford F-150 was purchased using a trade-in allowance of $42,500.00 for a 2018 Ford F-150, VIN 1FTEW1EG7JFA78967. The vehicle was purchased by McGINNIS and

Case 4:23-cv-00724-SEAL Document 1 Filed 12/08/22 Page 68 of 63

registered to MEDICAL COST SHARING, INC. Because the vehicle was recorded as owned by a non-profit organization, no taxes were assessed.

202. Between March 15, 2018, and April 2, 2019, payments totaling $12,460.78 were made towards the 2018 Ford F-150 lien from REYNOLDS' personal banking account and from a MCS non-profit business checking account:

| Account | Bank | Payments Made |
|---------|------|---------------|
| ▮0609 | Commerce Bank | $11,572.51 |
| ▮2117 | Commerce Bank | $888.27 |

203. A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2018 Ford F-150 were traceable to proceeds of the fraud and/or were traceable to proceeds involved in money laundering activity.

204. The 2018 Ford F-150 was purchased using a trade-in allowance of $17,562.15 for a 2015 Ford F-150, VIN 1FTEW1EF2FFD08221. The vehicle was purchased by McGINNIS and registered to MEDICAL COST SHARING, INC. Because the vehicle was recorded as owned by a non-profit organization, no taxes were assessed.

205. Between March 31, 2016, and January 2, 2018, payments totaling $20,893.18 were made towards the 2015 Ford F-150 lien from REYNOLDS' personal banking account and from a MCS non-profit business checking account:

| Account | Bank | Payments Made |
|---------|------|---------------|
| ▮2117 | Commerce Bank | $18,044.11 |
| ▮1239 | Bank Midwest | $2,849.07 |

206. A financial tracing analysis using the last-in, first-out accounting principle showed that all payments made on the 2015 Ford F-150 were traceable to proceeds of the fraud and/or were traceable to proceeds involved in money laundering activity.

207. Figure 5 below illustrates the flow of fraudulent MCS proceeds to the 2021 Ford F-250.

*Figure 5*



## LEGAL BASIS FOR SEIZURE AND FORFEITURE

208. I have been advised that in a forfeiture case, the government has the initial burden of showing probable cause to believe that a substantial connection exists between the property and the criminal activity. *United States V. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 251 (E.D. Va. 1993). "Probable cause" means a reasonable ground for belief beyond mere suspicion but need not amount to prima facie proof. *Id.* at 251–52. In making the probable cause determination, courts may consider information that might be inadmissible hearsay at trial. *Id.*

60

209. Title 18, United States Code, Section 1343 (wire fraud) criminalizes devising or intending to devise a scheme to defraud (or performing specific fraudulent acts) through the use of an interstate telephone call or electronic communication.

210. Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud) criminalizes attempting or conspiring to devise a scheme to defraud (or performing specific fraudulent acts) through the use of an interstate telephone call or electronic communication.

211. The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable wire fraud is subject to civil forfeiture. Pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained from wire fraud is subject to criminal forfeiture.

212. Title 18 United States Code, Section 1956 (money laundering) criminalizes knowingly conducting or attempting to conduct financial transactions with proceeds from specified unlawful activities (including wire fraud) with intent to promote or conceal in any manner, the proceeds from the specified unlawful activity.

213. Title 18 United States Code, Section 1957 (money laundering) criminalizes knowingly engaging or attempting to engage in a monetary transaction using criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity.

214. I am advised that property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal,

involved in a violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources. *United States v. Huber*, 404 F.3d 1047, 1057 (8th Cir. 2005).

215. I am further advised that when tracing forfeitable funds through a bank account that contains comingled funds or non-tainted funds, the Government may use any generally accepted accounting method, including "first in, first out" or "first in, last out," but the Government will always be constrained by the lowest intermediate balance principle. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-62 (2d Cir. 1986); *United States v. $88,029.08, More or Less, in U.S. Currency*, 2012 WL 4499084, *5 (S.D. W. Va. Sept. 28, 2012) (applying the "lowest intermediate balance" rule to grant summary judgment as to the forfeitability of drug proceeds in a commingled bank account). The lowest intermediate balance rule means that the amount of forfeitable funds on the date of the seizure may not exceed the lowest intermediate balance in the account between the date of the deposit of the allegedly forfeitable funds and the date of the seizure where the Government is relying on an actual tracing analysis (as opposed to relying on 18 U.S.C. § 984).

216. I am advised that the government may seek forfeiture of all proceeds involved in a scheme or conspiracy and need not deduct for any costs incurred in operating the scheme or conspiracy. *See United States v. Sigillito*, 899 F. Supp. 2d 850, 865 (E.D. Mo. 2012).

217. I am further advised that the Court may issue seizure warrants for both the civil seizure statute, 18 U.S.C. § 981(b), as well as the criminal seizure statutes, 18 U.S.C.§ 982(b)(1) and 21 U.S.C. § 853(f).

218.    This application seeks seizure warrants under both civil and criminal authority because the property to be seized could be placed beyond process if not seized by warrant.

## CONCLUSION

219.    The Subject Properties are subject to forfeiture because they constitute or were derived from proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud). The Subject Properties also are subject to forfeiture because they constitute property involved in transactions in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering) or are properties traceable to such property.

220.    Because these assets can easily be transferred or dissipated, I believe that a restraining order would be insufficient to assure the availability of this property for forfeiture.


FURTHER AFFIANT SAYETH NAUGHT.

_____
MILAN D. VRABAC, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to me telephonically this 8th _____ day of December, 2022.    Sworn to by telephone
2:16 PM, Dec 8, 2022



_____
HONORABLE LAJUANA M. COUNTS
UNITED STATES MAGISTRATE JUDGE

63